Morning ladies and gentlemen. For our first case, the third judge, Judge Kaney, is going to be present by telephone. I am here, Judge. Oh, hi Mike. Hi. Okay, great. Well, so we'll begin. And Mr. Trapp, this is a Central States case, the first case, Mr. Trapp. Thank you, Your Honor, and may it please the court. Trustees' determination that the local 135CBAs covered mechanics as a classification cannot be sustained under any standard of review. This is so primarily for two reasons. First, because neither the settlement agreement nor the CBAs, which presumably incorporated the settlement agreement, even contain the word mechanic, much less the classification. And second, because there's no reason for any of those documents to contain the word or the classification mechanic, because the fund openly admitted that it had no idea that Terry Gillespie was a mechanic at the time that it prepared and entered into the settlement agreement. Indeed, it didn't find out that he was a mechanic for nearly a decade after the settlement agreement. So we need to remember here right up front why the trustees would determine that the CBAs covered mechanics as a classification. And the reason is found in the fund rules. The fund rules clearly and plainly state that coverage must be by classification, and indeed they prohibit coverage through specified individuals. You cannot name a specific individual in a collective bargaining agreement and have that individual be covered. But now, for all this time, this fellow, while he was a mechanic rather than a driver, was considered very explicitly in the papers to be entitled to this retirement, had these pension rights. Isn't that true? Judge, I would say that is not true, because the only mention of Mr. Lanesky in the CBAs is in the pension rate clause, and that was specifically put in there so that he could be paid a higher rate under the assumption that he performed covered work. The primary basis for coverage under any CBA is that you have to perform covered work, and under these CBAs... Well, under ERISA, in Section 302 of ERISA, it makes clear that it needs to provide a detailed basis for the contributions to the pension fund. Here, again, going back to the trustees' determination, which was not that it covers Terry Lanesky individual. The trustees did not determine that Terry Lanesky was covered because his name was in the agreement. The trustees determined that Terry Lanesky was covered only because they say that mechanics were covered as a classification, as they must according to their own fund rules. I do grant that ERISA only has to have a writing, but again, that writing has to have the detailed basis for contributions, and this does not have a detailed basis for contributions for mechanics. What in ERISA requires a detailed basis for anything? What language in ERISA are you relying on? Well, that's in 29 U.S.C. 186 C5b. That's Section 302 of ERISA, and it says clearly that it's against the law to make contributions to a pension fund unless the writing contains the detailed basis for contributions. I emphasize again, Your Honor, that here, the detailed basis according to the trustees must contain the basis for contributions for mechanics as a classification, not for Terry Lanesky as an individual. These CBAs state clearly and unequivocally in numerous places that they cover only drivers. Why did Bulk, for all these years, so emphatically treat Lanesky as covered by the agreement? Well, the reason, Your Honor, is pretty simple. They assumed that he was covered, and indeed, he may have been covered by earlier collective bargaining agreements. Those are not in the record, and there was a lot that went on over the 40 years that he participated in this fund that changed over the course of time. In fact, the union that he was originally a part of merged with another union in the 1980s. Why didn't Bulk stop to deny the position it had taken for all these years? Well, first, the lawsuit was brought against us, Your Honor. This was not a lawsuit that we brought, and we are defending on that basis. But second of all, when you say all these years, I think that needs to be limited to just the 10 years that are at issue before the court. Just 10 years. 10 years is not a trivial amount of time. Sure, it's not, but, Your Honor, I would emphasize here that... I don't understand this mistake by Bulk. Well, the mistake was pretty simple. Bulk assumed that Mr. Lanesky was covered by the 135 pension. Well, how about looking... I mean, why didn't Bulk look into these things? Why didn't he just assume? Well, I think, as Your Honor is well aware... Big company. Why can't it get these things straight? Well, lots of people assume lots of things in collective bargaining agreements that are not actually the case, and the pension fund knows that better than anyone. I don't get it. Seems totally irresponsible behavior by Bulk. Well, Bulk was entirely responsible here. As I said... Irresponsible. Well, for the first 30 years of the relationship, we don't know what the contract said, and neither did the district court, and neither do the trustees. That's a fundamental misconception in this case. The pension fund wants to rely on some sort of backward evidentiary presumption to say these collective bargaining agreements that don't cover mechanics, that means none of them for the last 30 years covered mechanics, and that's... With all due respect, I think that's absurd, especially given that the National Labor Relations Act says that you have to negotiate these things. Well, I would emphasize in that, Your Honor, if you truly believe that it's Bulk's fault... Of course it's Bulk's fault. And you're entitled to think that, but... What do you mean I'm entitled to think that? You don't think Bulk screwed up? I think that Bulk made a mistake of law by assuming that because he was a 135 member... Well, that's what I call screwing up. It's a company. It's not some little individual. Well, you're right, and there's a statute that explicitly allows for companies that screw up, because it happens all the time, and that's the statute that says that you can get a refund. That's great. It happens all the time. You're in a great industry. Well, I'm just saying what happened, a mistake did happen, and frankly, there was never any evidence presented that it was intention. Bulk's presentation leaves with me, as with Judge Posner, the impression that for years Bulk tried to shaft the fund by playing games with the classification of the employees, and now is trying to shaft Lanieski personally. You shouldn't be surprised that the judiciary is resistant. No, I'm not surprised, but it's based on a misunderstanding, because if you go back through the records and if you go back... No, it's quite clear you tried to shaft the fund, and you're now trying to shaft Lanieski. That's perfectly clear. I beg to disagree, Your Honor, respectfully. I would say that... Well, what are you doing to make things good for Lanieski if you prevail in this litigation? This is not in the record, but it is in the underlying record before the withdrawal liability arbitrator that we already told Laneski when all of this went down, we told him that we would pay his pension if central states did not, and that's not in the record, but it's on the record. You're going to set aside a separate trust fund so that when Bulk goes bankrupt or distributes assets to creditors, that won't harm Lanieski? Well, I think the central states will go bankrupt before Bulk will, but in any event, Bulk has already told Laneski that they will make good on any pension that he gets shafted out of Is this a contractual obligation, or just being nice? I'm sorry? Is this, they just told him that this was their intention? We met with Mr. Laneski and told him. Is this contractual? It is not written out, but we told him that we did. Well, yes, I don't trust... So you haven't made any commitment to him. You just said, oh yeah, we'll do it. But you say it's unenforceable. I think that this case does not turn on... So what's it worth? I don't think it's worth anything. Well, I guess that's between Bulk and Mr. Laneski, who worked for them for four years. This is so unprofessional. Well, if I could... Just go to someone and say, well, we'll take care of you, unless we change our minds, and we don't take care of you. If I could take... Then Laneski doesn't know what to do. Can he count on this company's unsubstant... On this statement that is not a promise, that is not a commitment, or should he... Does he have to go and make his own arrangements for retirement? Well, I think that drives to a fundamental issue in this case. I mean, I think for you to rely on this noncommittal statement, we'll pay your pension. That is totally unpersuasive. You shouldn't have brought it up. It's nothing. Okay, well, I'm bringing it up because the court is dwelling on the fact that Mr. Laneski... Yeah, because this is not a commitment. So we don't have any idea whether Bulk will ever do anything for Lonievsky. That's true, but it's also... So it's not interesting that they've said this to him. Well, I brought it up only because... Well, you shouldn't have brought it up because it's not a commitment. Or alternatively, you should have made a contractual commitment. Sure, but we did commit to him just like we committed in an at-will employment state that you can work for us and we'll pay you. And he's done that for 40 years and we've made good on it. I would emphasize before I sit down, Your Honors, because I see my rebuttal time has gone on, that if your inclination is to think that we did something wrong and therefore we shouldn't get the refund, that's perfectly fine because we never even brought this lawsuit for the refund. We were never trying to get the money back. This was a lawsuit that was brought by central states. The point that we're making is this is a proxy battle for the withdrawal liability. But you are trying. This is just beyond absurd. You are trying to get the money back. You not only asked the district court to give you 10 years of contributions back, when the district court said, no, you took an appeal and you're asking us to give you 10 years of contributions back. You can't possibly say we're not here to get the money back. Sure. Well, only because, Your Honor, we view this as a proxy war for the withdrawal liability arbitration, under which central states brought this case, not us, and they did so in order to try to get a legal determination that there was no legal obligation to contribute on Lanesky's behalf and then have that imported into the withdrawal liability arbitration. We don't care whether we get the money back. There's a rule of advocacy, which is when you're in a hole, stop digging. Okay. Well, I didn't realize I was in a hole, so maybe that's a more basic problem. If you didn't realize that already, you should know it now. Okay. Thank you, Your Honor. Okay. Well, thank you, Mr. Trapp. Mr. Frangic? Good morning, Your Honors. May it please the court. At issue with Mr. Lanesky is the fact that every shred of conduct that Bulk did that is in the record in this case supports the fact that he was covered. Let's move on from that to the issue we didn't cover before, which is the status of the Arbitration Association's new fee schedule. Yes, Your Honor. Your Honor, in this case, it is our position that the fee schedule, as distinct from the AAA rules, need not be approved by the PBGC. The fee schedule, the rules themselves that were approved by the PBGC in 1986 explicitly state in the rules themselves that the fee schedule, in effect, at the time of filing will control. That language certainly suggests that the fee schedule can change, that the PBGC knew it could change, and that the PBGC approved of that fact. And it wouldn't be a surprise that a federal agency... You don't really want to try to read the minds of the people who sat on the Commission in 1986, do you? No, Your Honor, but I would... So why do you talk about what they knew or what they thought? Why don't we just analyze what they did? What they did, Your Honor, was approve the rules and the rules said that the fee, in effect, at the time of filing controls. That provision makes no sense if the only way you could get the fees changed was to go to the PBGC each time and put in a new schedule because then that would be the controlling schedule. There wouldn't be a need to have this provision in there. Now, Counsel for Bulk has made much in the recent filing that the AAA has now sought from the PBGC approval. That's not surprising given that this litigation is pending and has gone to the Seventh Circuit. Are similar arguments pending elsewhere? Or is this really limited to your fund? What other funds have adopted the AAA arbitration rules? I would say that there are several out there, Your Honor. I think other funds... Most litigants would not waste the money to litigate this case over... Well, it is a little peculiar that Bulk is spending a lot more on its lawyers than it would have had to pay the AAA. There's no doubt of that. Yes. And the alternative system that they're proposing which is to use the PBGC default rules requires the parties to agree on an arbitrator or go to federal court to get an appointment. Now, it won't surprise the court, I believe to know that funds and employers have differing opinions as to who the best arbitrators will be in a case. That's why the AAA rules work so well. That AAA provides a panel. The parties can strike the arbitrators that they don't approve of. And that AAA then makes the appointment from the mutually agreed upon arbitrators. The PBGC default rule, by contrast doesn't require anyone to agree to anything. Let me just make clear why I was asking the questions I was asking. I was trying to find out whether this is in litigation any place other than the Northern District of Illinois and the Seventh Circuit. I am not aware that it is in litigation anywhere else, Your Honor. Thank you. Now, Bulk raises a bunch of the parade of horribles.  you didn't believe it was in litigation Are there settlement discussions taking place? Your Honor, as far as litigation involving other funds other than the Devane v. Pauldo signed case that was cited in the briefs and I believe was settled, so is no longer pending litigation I'm not aware that there's any other employers who have raised the issue in the context of making their arbitration demand or have reserved the issue but most employers have simply paid the fee because it's cheaper to go through the AAA process and to simply pay the fee than it would be for them to spend thousands of dollars more litigating the issue and frankly I believe most of them realize that the AAA appointment system is superior to what the alternative would be. Thank you. As I was saying, Your Honor, Bulk's raised a parade of horribles that, for example there's nothing to prevent AAA from raising its fee to let's say $10 million to initiate an and there are constraints on AAA's ability to do so for one thing, the PBGC has the power to revoke its approval of the rules at any time Has anybody asked the PBGC to revoke its approval of the AAA rules? No, Your Honor and so first of all PBGC can revoke either on its own initiative or if somebody petitioned PBGC to do so secondly, because the arbitrator can in theory award costs to either party like a filing fee in a district court case presumably if an employer prevailed in an arbitration, it could ask to get those fees back Now I don't think the fund or the employers would continue to participate in a system where the fee to initiate arbitration is a million dollars because that would mean that one side or the other in every case is going to be paying that amount so that is a constraint and that practical concern is also a constraint on AAA's willingness to do so because they're a business too a not-for-profit business, but still a business and if nobody comes to their door because the fees are outrageous they cease to exist as an entity so all of those things really counsel against this parade of horribles that Bulk says Indeed, in the most recent filing last week in the Federal Register notice the approval was asked for the fee schedule itself not for the new rules so even AAA and the PBGC in describing the application has treated the fee schedule as something separate and distinct from the rules and as we've argued in our briefs, as the district court found and as the PBGC states in the Federal Register notice the 2013 AAA rules and the 1986 AAA rules are the same what is different is the fee schedule and in our belief the fee schedule does not need approval separate from the rules particularly here where the rules that were approved say that the fee schedule in effect at the time of filing will control doesn't require approval by PGBC? I'm sorry, your honor He's talking about approval by PBGC? Yes, the 1986 rule AAA rules say that the fee schedule in effect at the time of filing controls and those rules were approved by the PBGC so the last thing I'd like to touch on is the fact that the district court found that the 2013 AAA rules were invalid which is not the case because they're identical to the 1986 rules which were approved but the court then said that the 1986 rules aren't going to apply either and we're going to go to the PBGC default rules and that's erroneous, your honor as this court held in Alaga even if the 2013 AAA rules don't apply the 1986 AAA rules do apply and those rules are exactly the same and the rule provides that the fee schedule in effect at the time of filing controls so even if the judge was right that the 2013 AAA rules needed approval which we don't believe they did because they were exactly the same as the rules already approved the fee schedule didn't need to be but the judge instead of saying the 2013 rules apply or the 1986 rules apply which as I've said are the same thing said the PBGC default rules apply and that ruling can't be upheld even if the court found that the fee schedule did need to be approved unless there are further questions, your honor we ask that you affirm on the refund issue and reverse the district court on the AAA rules issue thank you, your honor Mr. Trapp, do you have anything further? Your honor, thank you I would like to again return to the refund issue and point out that the trustee determination here was that mechanics are covered as a classification the trustee determination that you're being asked to affirm is that the mechanics are covered only as a classification the CBAs nor the settlement agreement even contain the word mechanics and the fund director testified under oath that it would be a pretty steep climb to prove that a CBA that does not name the classification explicitly somehow covers that classification indeed he said he had never seen a CBA that does that so in order to affirm the trustees you have to find that this is a CBA that has never been seen before at central states not only that, there's no reason for these contracts to include mechanics as a classification because at the time that they entered into the settlement agreement, the fund assumed that Lanesky was a truck driver, he already would have been covered by the CBAs and so they proceeded under that basis there was no reason to say that they were adding something else moreover, even if the fund attempted to add something and they did not because they didn't know but even if they did, that's not their place under labor laws, the bargaining representatives right to bargain over who's covered by the contract What do you think is the source of the mistake about throwing him in with the drivers? None of these CBAs are before the court your honor, but when Mr. Lanesky came to bulk transport in 1972, we believe that mechanics were covered by the CBAs and they were covered up probably through the 80s and into the 90s at that point, because he had been working in 142's territory for so long, the unions merged, 298 merged into 135 he got somehow lost in the shuffle and because we treated him as being under 142 that whole time we still thought that he would get a 135 pension because he was a 135 member, indeed the 135 members themselves referred to the 135 pension as a 135 pension, they didn't call it central states they called it a 135 pension, so this was a mistake of law that bulk had, that they just thought he's a 135 member he'll get a 135 pension, and remember central states came out and audited bulk transport for more than 2 years with Terry Lanesky at the heart of that audit and at the end of it, they never said, hey Terry Lanesky shouldn't be contributed for, he shouldn't be covered here we had no reason to think otherwise, and so we continued to contribute, and the fund assumed that he was a driver all along, so there was no reason for anyone to catch this, it was only caught when we got hit with the $700,000 worth of withdrawal liability and said, wait a second we never should have been contributing for him in the first place and that is consistent with what Al Nelson said when he said he'd never seen a CBA that does what this one has to do in order to uphold the trustees Bill Turner, who was the union business agent was deposed and testified under oath that he did not include mechanics in the CBA, and in fact he didn't intend mechanics to be included, and that let's see, my time is up, I'll just finish this point and that the work that Terry Lanesky performed was not covered by the CBA, and I think that it was clear that it wasn't, and I ask your honors to look at that and I would emphasize again that the legal doctrine here as to whether we had a legal obligation to contribute is different from whether we get the money back that legal obligation is at the heart of the withdrawal liability case, and I think this is just a proxy war for that and I would ask you to give that full consideration Thank you. Okay, well thank you Mr. Trah Mr. Frangic and we'll take a brief recess and be back